# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 1982 | **DATE** | 3/22/2001 |
| **CASE TITLE** | INTERMATIC INC. vs. DENNIS TOEPPEN | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER FINDINGS OF FACT AND CONCLUSIONS OF LAW: This Court hereby enters final judgment for defendant, and against plaintiff as to plaintiff's willfulness allegations in Count III; Plaintiff's trademark infringement allegations (Count I); plaintiff's federal unfair competition claims (Count II); plaintiff's common law unfair competition claims (Count V); plaintiff's Illinois Deceptive Trade Practices claim (Count VI); and plaintiff's Illinois Consumer Fraud Act claim (Count VII). Judge Williams previously entered judgments of permanent injunctive relief on Counts III and IV. All parties are to bear their own attorneys' fees and costs. This case is hereby terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 23 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 91 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTERMATIC INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 96 C 1982 |
| | ) | |
| v. | ) | Judge Ronald A. Guzman |
| | ) | |
| DENNIS TOEPPEN, | ) | |
| | ) | |
| Defendant. | ) | |

**DOCKETED**
**MAR 2 3 2001**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Intermatic Incorporated ("Intermatic"), brings this action in seven counts against

defendant Dennis Toeppen ("Toeppen"). Intermatic alleges that Toeppen's use of the Internet

domain name "intermatic.com" violates sections 32(1) (Federal Trademark Infringement)(Count

I), 43(a)(Federal Trademark Unfair Competition)(Count II), and 43(c)(Federal Trademark

Dilution Act of 1995) of the Lanham Act (Count III), 15 U.S.C. § 1114(1); 15 U.S.C. § 1125(a);

and 15 U.S.C. § 1125(c) respectively. Intermatic also alleges that Toeppen's conduct violated the

Illinois Anti-Dilution Act, 765 ILCS 1035/1 et seq. (Count IV); the common law of Unfair

Competition (Count V); the Uniform Deceptive Practices Act, 815 ILCS 510/1 et. seq. (Count

VI); and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2

(Count VII). On November 26, 1999 Judge Williams adopted Magistrate Denlow's Report and

Recommendation that summary judgment be granted in part as to Counts III (Federal Trademark

Dilution Act Count) and IV (Illinois Ani-Dilution Act Count) but denied as to Counts I, II, V, VI

and VII. In adopting the magistrate judge's recommendation Judge Williams allowed for

1

injunctive relief under both the state and federal dilution acts. She denied, however, additional relief available under the federal act upon a finding of willfulness; finding instead that a material issue of fact existed with regards to willfulness.

The parties subsequently agreed that the trial could be by paper and that the declarations, documents and other evidentiary materials submitted in connection with the trial by paper would constitute the evidentiary record for the Court. The Court has carefully considered the evidence and arguments submitted by the parties in this Rule 52 proceeding. Set forth below are the Findings of Fact and Conclusions of Law that form the basis for the Court's rulings, as required by Rule 52(a). To the extent that any Findings of Fact constitute a Conclusion of Law, the Court hereby adopts it as such and to the extent that any Conclusion of Law constitutes in whole or in part a Finding of Fact, the Court adopts it as such. *Miller v. Fenton,* 474 U.S. 104, 113-114, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985).

Since 1941, Intermatic Incorporated has conducted extensive business under the INTERMATIC trade name, selling various products bearing its INTERMATIC marks. Intermatic manufactures and sells a variety of electrical and electronic products, including computerized and programmable timers, time switches, pool and spa controls, programmable electronic timer switches, programmable in-wall timers, photo controls, weatherproof outlet covers, residential and professional landscape lighting, and power surge suppressors, all sold under the INTERMATIC trademark.

Intermatic also sells electronic products that relate to computers and software. For example, Intermatic sells modules for its electronic time switches that contain a computer chip with software embedded in it. These computerized electronic timing devices are part of a

2

sophisticated developing product line for the company. Intermatic may also at some point sell the underlying software. Many other Intermatic products are computerized in that they perform computer functions. For example, Intermatic markets a line of astronomic time switches that are computer operated. Intermatic also has plans to provide its product catalogues in the form of a software disk but does not currently sell a software product.

Intermatic owns five trademark registrations issued by the U. S. Patent and Trademark Office for its Intermatic mark that are valid and incontestable under the provisions of 15 U.S.C. §1065. Two are for the unstylized word INTERMATIC. Three are for a stylized logo of the word INTERMATIC as shown in those registrations and rendered below. The stylized logo is referred to as the "HOURGLASS I." The hourglass I is Intermatic's only logo and it appears on all of Intermatic's products (other than OEM parts or "house brand" products manufactured for particular retailers). Intermatic is the exclusive owner of the INTERMATIC trademark, and there are no known third-party users of the mark in the United States. Intermatic has numerous other trademarks including MALIBU, ELECTRASOURCE, ELECTRAK, SUPERCOP AND POWERALERT.

Intermatic's sales and advertising of INTERMATIC branded products have been continuous since the early 1940s. Between 1988 and 1996, sales in the U.S. exceeded $850 million. Intermatic's products are sold at hundreds of well-known stores, such as True Value, Home Depot, Sears, Ace, Venture, K-Mart, Wal-Mart, Lowes, Builder's Square, Target, Grainger, Home Base, Menards, Price/Costco, and Radio Shack. Intermatic products are also sold through computer outlets and computer catalogues such as Macworld. Intermatic's products prominently bear the INTERMATIC name and trademark, and well over 100 million units have

been installed in home and businesses throughout the United States over the last 10 years. Intermatic's domestic competitors are companies called Paragon Electric, Torque Time Controls, and First Alert. It also competes with some importers.

Advertising and promotional expenditures for products bearing the INTERMATIC mark between 1988 and 1996 exceeded $16 million. Through its co-operative advertising program, Intermatic products are advertised in over 700 print ads per year, each displaying the INTERMATIC mark. Such ads appear in newspapers throughout the country, store flyers, and free-standing inserts. The aggregate monthly readership impressions are approximately 20 million.

Intermatic also advertises and promotes its INTERMATIC products, mark and name by way of trade shows held throughout the United States, radio and television. Intermatic advertises its products to customers and prospective customers in the computer field, along with other targeted consumer groups. As a result of the extensive use, sales, advertising, promotion, publicity and favorable acceptance and recognition by the public, the INTERMATIC tradenames and trademarks have become well-known and are extremely valuable asset to Intermatic, representing tremendous goodwill.

Toeppen operates a company involved in the transportation business under the name Suburban Express and owns an Internet service provider business under the name Net66. The Internet is a vast and expanding network of computers and other devices linked together by various telecommunications media. These links enable computers on the Internet to exchange and share data. As Judge Williams explained in her Summary Judgment Order dated November 26, 1996, each device available to the Internet employs a "domain name" as an address by which

4

it can be contacted from other computers. *Intermatic v. Toeppen,* 947 F. Supp 1227, 1239 (N.D. Ill. 1996). Most web browsers will show somewhere on the screen the domain name of the web page being shown. However, the domain name does not appear on the web page itself. Rather, it appears in a separate window entitled "address." There is no technical connection or relationship between a domain name and the contents of the corresponding web page(s). Intermatic could place its web page at any available domain name. All web browsers will display "banners." A banner appears at the top of the computer screen when a web page is returned. The contents of the banner are controlled primarily by the author of the web page and normally display the "title" of the web page along with the name the browser program. Domain names using the suffix <com> are established by registration with an organization called Network Solutions, Inc. ("NSI"). With some limitations, NSI will register any combination of up to 24 alphanumeric characters as a domain name on a first-come, first-serve basis to anyone who has access to at least two domain name servers.

Despite having been aware of Intermatic and its trademark since at least as early as 1980 or 1981, Toeppen nevertheless registered <intermatic.com> with NSI in November or December of 1995. NSI registered the domain name to Toeppen's domain name server. Prior to registering the <intermatic.com> domain name, Toeppen had never used the term Intermatic for any purpose. Toeppen was not aware of any other business that used INTERMATIC, apart from the plaintiff. For a period of less than one week, Toeppen used the address to show a software program for Internet automatic billing software that he intended to release under the name Inter<>Matic. Toeppen had the software developed by an outside consulting service at a cost in excess of $50,000; however, it is undisputed that Toeppen never sold the software that was to be

5

titled "Inter<>Matic" under that name or any other name. At no time has Toeppen advertised the intermatic.com domain name in association with any goods or services.

In explaining the basis for his registration, Toeppen testified that he "registered the domain name <intermatic.com> in order that I would gain property rights in the domain name <intermatic.com.>" Toeppen also registered approximately 240 other tradenames with Network Solutions, including but not limited to: <Panavision.com>, <bugsbunny.com>, <deltaairlines.com>, <saturdaynightlive.com>, <greatamerica.com>, <circuscircus.com>, <neimanmarcus.com>, <eddiebauer.com>, <britishairways.com>, and numerous others without seeking permission from any entity that had previously used the names he registered.    One reason for some of Toeppen's registrations was his belief that certain domain names would be valuable as vanity names to one or more other parties and, therefore, could be transferred to a party wanting it as a vanity name for more than the $100 cost of registration to Toeppen. Toeppen was aware that the trademarks and trade names he registered as domain names are well-known and extremely valuable assets to the companies that owned the corresponding marks.  He also knew that none of the companies could use their own famous and valuable trademarks and trade names as domain names on the Internet while he retained ownership of the registration.

Toeppen admits that he has received as much as approximately $50,000 for the transfer of domain name registrations.  The actual amount, however, may be higher.  Like Intermatic, many of the companies that owned trademarks that Toeppen registered as domain names sought to recapture their famous and valuable marks and sent Toeppen cease and desist letters. Intermatic, Panavision, American Standard, Cooper Tire, Tamarac and General Housewares also filed lawsuits against Toeppen.  There may be others as well. Ultimately, all the known cases against

6

Toeppen were settled with the exception of the lawsuits filed by Intermatic and Panavision.

In response to one of Mr. Toeppen's registrations he was contacted by an owner (not Intermatic) of a corresponding trademark that threatened to bring legal action against him if he did not relinquish the registration. Mr. Toeppen brought that matter to the attention of Joseph Murphy, an attorney in Champaign, Illinois who had represented Mr. Toeppen in a prior trademark dispute. Murphy advised Toeppen that a domain name, since it is an address, does not—as an address—identify the source of a product or service. Murphy opined that the use of a domain name as an address was not a use capable of infringing a trademark.

In late 1995, Intermatic determined to conduct business on the Internet by advertising its products on a web site located at the domain address <intermatic.com>. Like most companies, Intermatic believes, that having its web site at a domain address bearing its trade name was essential to its ability to conduct business on the Internet because it would allow customers and potential customers to access the web site by simply entering a domain address identical to Intermatic's trademark and tradename. Intermatic attempted to register the domain name <intermatic.com> in December 1995. NSI refused Intermatic's registration, since the domain name had already been registered by Toeppen. As a result, Intermatic made a written demand on Toeppen that he relinquish or assign the <intermatic.com> domain name registration.

After Intermatic contacted Toeppen, Toeppen contacted his lawyer. His lawyer advised Toeppen that, in his opinion, Toeppen's use of <intermatic.com> should not be the basis of liability, but since, there was no case law directly on point, it was a novel issue of law and there was a potential for liability. The Federal Trademark Dilution Act was signed into law by president Clinton on January 16, 1996 and became effective as of that date. *Federal Trademark*

*Dilution Act of 1995,* 15 U.S.C. § 1125(d) Toeppen's counsel reviewed the Federal Trademark

Dilution Act at or about its effective date and discussed its impact with Mr. Toeppen. The

substance of his counsel's advice did not change, particularly since the Federal Trademark

Dilution Act was a brand new statute and its breadth had been untested by any court. *Id.*

Toeppen withdrew the software name and the web page but refused to release or to assign the

<intermatic.com> domain name, which he continued to use for a different web page comprising a

map of Champaign, Illinois, the community where Toeppen resides. Toeppen refused to

capitulate to Intermatic's demand that he abandon his domain registration. Rather, Toeppen

decided to test his legal right to hold domain names corresponding to the trademarks of third

parties. *Id.*

Intermatic has never manufactured or sold any maps and Intermatic has no relationship to

Champaign, Illinois other than the fact that there is an Intermatic distributor there. Intermatic

during the time in question also never attempted to determine consumer interest in the Internet

nor had it sold any of its products through the Internet. Toeppen's revised web-page made no

reference to Intermatic and did not advertise or sell any product. Toeppen then attempted to sell

the domain registration to Intermatic. Intermatic refused to pay money for its own trademark.

Ultimately, on about April 16, 1996, NSI put Toeppen's <intermatic.com> domain name on

hold in response to a formal request by Intermatic. The domain name was not available for use

by any party until Judge Williams ordered that it be turned over to Intermatic as part of its

summary judgment order in November of 1996. In December of 1996, in response to the

Court's November 26, 1996 summary judgment order on dilution, NSI assigned the domain

name to Intermatic, which commenced use of the domain name in January of 1997. Intermatic's

8

logo, the HOURGLASS I, is now a prominent logo on the opening screen of Intermatic's web site. The banner on the web page reads "Intermatic HomePage."

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and (b) and 1367, to decide the claims presented in plaintiff's complaint. Venue is proper in this court.

## CONCLUSIONS OF LAW

### INTERMATIC'S TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS AND LIKELIHOOD OF CONFUSION

In order to prevail under the federal trademark infringement claim, the federal unfair competition claim, and the state deceptive trade practices and unfair competition claims, (Counts I, II, V, VI and VII), Intermatic need only prove that: 1) it owns prior rights in the INTERMATIC mark; and 2) Toeppen's use of "intermatic.com" is likely to cause consumer confusion, deception, or mistake. *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.* 94 F. 3d 376, 380 (7th Cir. 1996).

### A. PRIOR RIGHTS IN THE INTERMATIC MARK.

Intermatic's name and prior rights over Toeppen to use the INTERMATIC name are clear. Intermatic's first use of the Intermatic name and mark predates Toeppen's first use of "intermatic.com" by more than fifty years. Also, it is undisputed that Intermatic holds a valid registration for the trademark INTERMATIC.

### B. LIKELIHOOD OF CONFUSION.

The Seventh Circuit has held that the following factors should be weighed to determine whether a likelihood of confusion exists:(1)the degree of similarity between the marks in

9

appearance and suggestion; (2) similarity of the parties' products or services; (3) the area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) the strength of the complainant's mark; (6) actual confusion; and (7) an intent on the part of the alleged infringer to palm off his products as those of another. *Forum Corp. of North Am. v. The Forum Ltd.*, 903 F. 2d 434, 439 (7th Cir. 1990). The test is not whether the public will confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or service with which an earlier mark is connected. *Nike, Inc. v. "Just Did It" Enter.*, 6 F. 3d 1225, 1228-29 (7th Cir. 1993).

### 1. Similarity of Marks

Trademarks are confusing similar if they are similar in sound, appearance, meaning or connotation. *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 880 (N.D.Ill. 1999)(citing *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1000). The court should consider any memorable feature of the marks when analyzing the likelihood of confusion, and "must consider the trademark in light of what occurs in the real world, recognizing that the marks will be confronted separately by consumers in the marketplace, rather than compared sitting side by side on a podium in a courtroom. *Id.* at 880 (citing *Forum Corp. of North Am. v. The Forum Ltd.*, 903 F. 2d 434, 440 (7th Cir. 1990); *Knaack*, 955 F. Supp. at 1000 (citing *James Burrough Ltd. V. Sign of Beefeater, Inc.*, 540 F. 2d 266, 275 (7th Cir. 1976))).

Courts have found that this factor is the most important in the likelihood of confusion analysis. *Fisons Horticulture, Inc. v. Vigro, Indus.*, 30 F. 3d 466, 482 (3d Cir. 1994). Generally, the more similar the marks, the more confusion is likely. *Exxon Corp. v. Texas Motor Exchange*

*of Houston, Inc.,* 628 F. 2d 500, 503 (5th Cir. 1980). This Court previously determined that the <intermatic.com.> domain name registered by Toeppen is similar to Intermatic's federally registered INTERMATIC mark because it contains the term "intermatic." *Intermatic,* 947 F. Supp. at 1234-5. It is undisputed that Toeppen's domain name incorporates Intermatic's mark in its entirety thus the INTER<>MATIC designation is confusingly similar to the INTERMATIC mark, despite the fact that Toeppen's domain name is in standard typeface and interrupted by opposing arrows. Both contain the identical letters in sequence and the words are pronounced the same and the two letters combinations are clearly the dominant portions of INTER<>MATIC. Thus, while the names are not identical, the overall impression reveals that the similarities between the two marks outweigh the differences such that consumers are likely to confuse one for the other. Accordingly, the merits are similar.

### 2. Similarity of Products and Services

"In determining the likelihood of confusion that exists due to the similarity between the parties products, 'the question is whether the products are the kind the public attributes to a single source.'" *Blue Shield Assoc. v. American Express Co.,* 1999 WL 1044825, *4 (N.D. Ill. Nov. 16, 1999)(Judge Kennelly)(quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F. 2d 1079, 1089 (7th Cir. 1988)). "Where the goods are in close competition, trademarks need not be as similar in order to find infringement." *Nike, Inc.* 6 F. 3d at 1230 (citing *SquirtCo. v. Seven-Up Co.,* 628 F. 2d 1086, 1091 (8th Cir. 1980).

As set forth in *Flow Technology, Inc. v. Picciano,* 18 U.S.P.Q. 2d 1970, 1972 (TTAB 1991) it has long been settled that goods do not have to be the same or even competitive to give rise to a likelihood of confusion. It is sufficient for that purpose that there be a relationship

between the goods such that they are likely to be encountered by the same person under circumstances which would, because of the marks used thereon, give rise to the presumption that they originate from or in some way are associated with the same producer. (citing *Kraft, Inc. v. County Club Food, Ind. Inc.*, 230 U.S.P.Q. 549 (TTAB 1986).

It is undisputed that Toeppen planned on using the <intermatic.com> domain name and the INTER<>MATIC mark to promote a software program for Internet billing that he was in the process of developing. It is also undisputed that Toeppen never sold the software and the software was only advertised on Toeppen's web site for approximately one week. It is also undisputed that Toeppen subsequently displayed a map of Champaign, Illinois after he refused to transfer the domain name to Intermatic.

The undisputed facts also reveal that Intermatic manufactures and sells a variety of electrical and electronic products including computerized and programmable timers, time switches, pool spa controls, programmable in-wall timers, weatherproof outlet covers, residential and professional lighting and power surge suppressors. Intermatic also sells electronic products that relate to computers and software such as Computer Aid Durce ("CAD"), state of the art software technology which provides three dimensional and solid model viewing before production tooling. The company also markets products such as power surge suppressors, timers and its ELECTRASOURCE line of products that are directly used in connection with computers.

If the Court were to assume that customers of Toeppen (especially the customer who has previously purchased CAD from Intermatic) during the one week period in question, did in fact go to Toeppen's web page which advertised the information as to Toeppen's Internet billing software it could be concluded that Toeppen's Internet billing software was similar to possibly

12

one or two of Intermatic's products.  On the other hand, it is aslo undisputed that a majority of

Intermatic's goods and services are specialized in the electrical and electronic product field

(programmable timers, time switches, pool and spa controls),  while Toeppen's product (the

Internet billing software) would have been considered strictly software related. We find that the

software program Toeppen advertised for one week in 1995 possibly (and a weak possibility it

is) could have been concluded to be the same type of product or service offered by Intermatic in

light of Intermatic's sale of products like CAD (Computer Aided Design).  Possibly a consumer

would have thought that Intermatic was expanding its product line to new products that work

with the Internet.  It is doubtful, however, that an Intermatic customer did in fact access

Toeppen's website during the one week period in question and it is undisputed that Mr. Condon

(Intermatic's expert consultant) testified during the relevant period Intermatic never sold a

computer program per se.

Given the slight similarity or relatedness in the parties goods and services, it is difficult to

believe that a consumer who might have seen the <intermatic.com> domain name during the one

week period and who is familiar with INTERMATIC's trademarks would have believed that

INTERMATIC had endorsed the Internet software package especially in December of 1995,

when INTERMATIC had never advertised its products on the Internet. Moreover, Intermatic's

federal trademark registrations do not cover software rather they cover various switches, timers

and manual controls, house address signs, and indoor electrical greenhouses and portable electric

heaters. Therefore, this factor suggests only a very slight likelihood of consumer confusion.

### 3. The Area and Manner of Concurrent Use

This "factor requires the court to consider whether there is a relationship in use,

promotion, distribution or sales between the goods and services of the parties." *Planet Hollywood*, 80 F. Supp. 2d at 882. Judge Williams previously concluded that there was no area or manner of concurrent use between Toeppen's domain name registration and Intermatic's trademark during the relevant period when Toeppen's software page was available. *Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227, 1234 (N.D. Ill. 1996). Nothing new has been presented by the parties.

During the relevant period, Intermatic's products were primarily sold through retail hardware and home improvement stores like Ace, Tru Value, Sears, K-Mart and Wal-Mart and Mac World's web page, which is directed to computer users. However, as of December of 1995, Intermatic had no presence on the Internet and as late of June of 1997 Intermatic had never attempted to sell anything through the Internet. The two channels of trade, while not totally remote are distinct to a significant degree. This is because the period of time in which Toeppen advertised his software was so brief and because customers of Intermatic's products during this period more than likely would have been purchasing from a Sears or a K Mart type of establishment rather then over the Internet due to the youth of the Internet itself and plaintiff's lack of presence on the Internet. Therefore, this factor strongly suggests that there was no likelihood of consumer confusion.


### 4. Degree of Care Likely To Be Exercised by Consumers

"Since the likelihood of confusion inquiry considers the likelihood of confusion by the consuming public, courts must consider the level of sophistication of potential purchasers of the products and services in issue. *Planet Hollywood*, 80 F. Supp. 2d at 882. It is well established

that likelihood of confusion should be determined by viewing the two marks from the perspective of an ordinary consumers of the goods and services. *Restatement (Third) of Unfair Competition* § 20 cmt.g&h (1995). Applying these principles the record establishes that consumers seeking information on Intermatic and its products via the Internet are likely to type in <intermatic.com>. In *Panavision Int'l v. Toeppen*, 141 F. 3d 1316, 1327 (9th Cir. 1998), the Ninth Circuit described how consumers frequently locate web sites of particular companies:

> A significant purpose of a domain name is to identify [to consumers] the entity that owns the web site. A customer who is unsure about a company's domain name will often guess that the domain names is also the company's name.

In dicta the Second Circuit Court of Appeals noted that the most common method of locating an unknown domain names is simply to type in the company name or logo with the suffix .com. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.* 202 F. 3d 489, 493 (2nd Cir. 2000). Other courts have gone further and found that many Internet users are not sophisticated. *Jews for Jesus v. Brodsky,* 46 U.S.P.Q.2d 1652, 1669 (D.N.J. 1998). The harm to Intermatic, in short, is the likelihood that potential purchasers will think there is some connection between Intermatic and Toeppen.   On the other hand, once the map of Campaign, Illinois was posted consumers would obviously know that they were not at Intermatic's website. Thus, the court finds that the degree of care to be exercised by the consumers weighs slightly in favor of Intermatic but in light of the short period of time involved it is of little consequence.

### 5. Strength of Intermatic's Mark

"The strength of a trademark refers to its 'distinctiveness..., or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ..source."

*Planet Hollywood,* 80 F. Supp. 2d at 882 (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 959 (7th Cir. 1992)). This Court has already found that the INTERMATIC mark to be strong, famous and entitled to broad protection as a matter of law. *Intermatic,* 947 F. Supp. at 1236. The fact that it is a coined mark with no known third-party users and it has acquired a wide-spread reputation due to its long use, high volume of sales and substantial advertising and promotion further contributes to the strength of the mark. *Polaroid Corp. v. Polaroid, Inc.* 319 F. 2d 830, 831 (7th Cir. 1963). Moreover, there is no evidence thtoat any third-party use of the name Intermatic other than Toeppen's use has occurred. Thus, the strength of the Intermatic mark is undisputed.

### 6. Actual Confusion

"The test of infringement is the likelihood of confusion, not the proof of actual confusion." 3 McCarthy, ¶ 23:12 (emphasis in original). Accordingly, "t]he plaintiff is not required to prove any instances of actual confusion." *Id.;* See also, *Sands, Taylor & Wood Co.,* 978 F.2d at 960; *Tisch Hotels, Inc. v. Americana Inn Inc.,* 350 F.2d 609, 611-13 (7th Cir. 1965). It is undisputed that there is no evidence of actual confusion and its absence is easily understood. Intermatic, upon learning of Toeppen's use of its trademark, caused a cease and desist letter to issue. Toeppen then withdrew the information as to the Internet billing software and replaced it with a map of Champaign. Accordingly, the Court can only infer from the above facts that the likelihood of confusion during this brief period was *de minimus.*

### 7. Toeppen's Intent

In the Seventh Circuit, an intent to confuse, or evidence of deliberate copying, is one of several factors to be weighed in determining a likelihood of confusion and infringement. 3

16

McCarthy at ¶ 23:111. "If a court finds intent (i.e. deliberate imitation of a mark), this factor weighs heavily in favor of finding a likelihood of confusion." *Planet Hollywood*, 80 F. Supp. 2d at 884; see also *Computer Care v. Service Systems, Enter., Inc.* 982 F. 2d 1063, 1069 (7th Cir. 1992).(Although deliberate copying does not create a presumption of consumer confusion, it is an "important factor bearing on the likelihood of confusion." *Schwinn Bicycle*, 870 F.2d at 1183 (quoting *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 857 (7th Cir.1982) (emphasis added in *Schwinn Bicycle* )). The Court has carefully considered the evidence offered by Intermatic on the issue of intent. It is undisputed that Toeppen was the person solely responsible for registering the domain name and he knew of Intermatic and its trademark at the time he registered the domain name. Toeppen also knew of no other third-parties that used the INTER<>MATIC designation and it is undisputed that Toeppen was driven by the desire to profit from the registrations of these names.

On the other hand, Toeppen has argued that he was motivated in part to test the legality of arbitraging domain names and he did in fact seek legal advice. He also points out that the period in question was very brief in time and when Intermatic first contacted him he withdrew the information as to his proposed software although he did not immediately turn over the domain name.

Copying as evidence of intent to confuse and, therefore, of the likelihood of confusion is essentially a reasonable inference drawn from circumstantial evidence. The problem with applying this principle to the case at bar is that the circumstances of this case are different from the circumstances upon which this evidentiary principal is founded. This is not a case where the defendant, the accused infringer, is attempting to sell a competing product. On the contrary, the

17

defendant herein appears to be selling no product, or at most a non-competing product for an extremely short period of time. Therefore the inference that are rises when a competitor attempts to make its product or its trade dress look precisely like the product or trade dress of its competition is not appropriate under the circumstances of the case at bar. Toeppen did copy the trademark, but not for the purpose of selling a competing product. He did it, the evidence shows, primarily – if not exclusively – for the purpose of preserving the domain name. In light of this, it does not appear to us that evidence of copying in this case is an important indication of the likelihood of confusion among the consuming public with respect to the origin of a product. In fact, it is clear, that defendant's use of plaintiff's trademark was not primarily for the purpose of selling a product at all. This, no doubt, is why defendant so readily agreed to be enjoined from using the web site attached to the domain name "Inter◇Matic" for the sale of any product or service whatsoever. We are aware of the language in *Panavision Int., L.P. v. Toeppen,* 938 F. Supp at 621: "[h]e act[s] as a 'spoiler,' preventing *Panavision* and others from doing business on the Internet under their trademarked names unless they pay his fee." While this language does appear to accurately described the plaintiff's activities, we do not, in the case before us, believe that it establishes likelihood of confusion or malicious intent in the context of unfair competition. Here the Court does not believe that Intermatic has shown that Toeppen's use of the Intermatic mark was solely motivated by bad faith..

Considering all of the foregoing factors, the Court concludes that plaintiff has failed to prove a likelihood of consumer confusion between the Intermatic mark and the domain name. Accordingly, we find for defendant on the remaining counts of the complaint.

18

# WILLFULNESS OF TOEPPEN'S DILUTION

Having found no infringement or unfair competition, it is not necessary to consider the appropriate remedies for Intermatic under those counts. However, the controversy still at issue in this case is whether Toeppen's conduct was willful, thus justifying an award of attorneys fees to Intermatic under the provisions of 15 U.S.C. §§1125(c)(2) and 1117. Intermatic asserts that Toeppen acted with willful intent to hinder Intermatic's commercial exploitation of the Internet. Toeppen maintains that he was merely asserting and defending his position that trademark owners do not have a preemptive right to register their trademarks as domain names.

As in *Panavision International, L.P. v. Toeppen,* 945 F. Supp. 1296 we find that an award of attorneys' fees in this case would be inappropriate. The particular issues dealt with in this case were primarily issues of first impression and at the relevant period there was a lack of legal precedent regarding issues arising from the intersection of trademark law and the Internet. Furthermore, the remedies available under the Anticybersquatting Consumer Protection Act ( "ACPA"), 15 U.S.C. § 1125(d)(2)(D)(i) depend on when the unlawful activity took place. A person who unlawfully registers, traffics in, or uses a domain name after the ACPA's date of enactment, November 29, 1999, can be liable for monetary damages under 15 U.S.C. § 1117(d) and can have the domain name transferred to the owner of the mark or canceled under 15 U.S.C. § 1125(d)(2)(D)(i). The only remedy available for ACPA violations that occurred before November 29, 1999, however, is to have the domain name transferred to the owner of the mark or canceled. *Anticybersquatting Consumer Protection Act,* Pub. L. No. 106-113, § 3010, 113

19

Stat. 1536. Toeppen's alleged cybersquatting occurred before the ACPA's date of enactment. Nor do we find willful mess. It is apparent that defendant neither damaged nor intended to damage plaintiff's reputation. It is also apparent that he did not in any way deceive or intend to deceive the purchasing public. He did no more than what entrepreneurs and businessmen do or try to do every day. He used his particular legitimately gained knowledge, in this case of a new technology, to position himself, before others did so, so as to attempt to make a profit with very little work. At the time he did this there was a vacuum in both statutory and case-law regarding the degree to which, if any, the law of trademarks and unfair competition protected trademarks from being used in this manner. In addition, when plaintiff objected the defendant immediately did all he could do to ensure that he was not damaging plaintiff's reputation in any way. He professed a willingness not to use the domain name in question to sell *any* product or service. Thus eliminating any potential for product confusion. In short, he did everything but give up his right to the use of the domain name. This he did not have to do as it was not at all clear that he was legally bound to do so.


## CONCLUSION

This Court hereby enters final judgment for defendant, and against plaintiff as to plaintiff's willfulness allegations in Count III; plaintiff's trademark infringement allegations (Count I); plaintiff's federal unfair competition claims (Count II); plaintiff's common law unfair competition claims (Count V); plaintiff's Illinois Deceptive Trade Practices claim (Count VI); and plaintiff's Illinois Consumer Fraud Act claim (Count VII). Judge Williams previously entered judgments of permanent injunctive relief on Counts III and IV. All parties are to bear

their own attorneys' fees and costs.  This case is hereby terminated.

**SO ORDERED**                    ENTER:  3/22/01

Ronald A. Guzman
United Stated Judge